In re HANOVER SQUARE
SECURITIES, Debtor.

Bankruptcy No. 83 B 6155 (TLB).
TP 70056.

United States Bankruptcy Court,
S.D. New York.

Nov. 22, 1985.

Hughes, Hubbard & Reed by Alan H. McLean, Jacqueline D. Gilbert, New York City, for trustee.

Munves, Tanenhaus & Storch, Richard, Patricia and Sylvan Ross, by Steven G. Storch, New York City, for claimants.

Theodore H. Focht, Gen. Counsel, by Josephine Wang, Washington, D.C., for Sec. Investor Protection Corp.

## DECISION AND ORDER ON TRUSTEE'S MOTION TO AFFIRM HIS DECISION DENYING CUSTOMER STATUS

TINA L. BROZMAN, Bankruptcy Judge.

This dispute is the latest in a long series seeking to determine who is entitled to the protection given to "customers" of a broker-dealer undergoing liquidation in accordance with the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. § 78eee(b)(1). On December 15, 1983, and upon application by the Securities Investor Protection Corporation ("SIPC"), the United States District Court for the Southern District of New York entered an order adjudicating the customers of Hanover Square Securities Group, Inc. ("Hanover Square" or the "Debtor") to be in need of protection under SIPA. James W. Giddens was appointed trustee ("Trustee") to oversee the liquidation of the Debtor's business. Pursuant to 15 U.S.C. § 78eee(b)(4), the liquidation proceeding was removed to the bankruptcy court.[1]

The facts, to which the parties stipulated, are set forth below:

1. On or about November 30, 1980, Richard and Patricia Ross entered into a Secured Demand Note and Secured Demand Collateral Agreement ("Agreement") with Arthur H. Ross, Inc., the predecessor firm to Hanover Square. The principal amount of the Secured Demand Note was $220,000. As collateral for their obligation under the Agreement, Richard and Patricia Ross pledged various bonds whose face amounts totalled $345,000. The various bonds were pledged and delivered to Hanover Square

in return for 10% annual interest, payable monthly, on the principal amount of the Secured Demand Note.

2. Similarly, on or about December 15, 1980, Sylvia Ross entered into a Secured Demand Note and Agreement with Arthur H. Ross, Inc. The principal amount of her SDN was $125,000 and she pledged and delivered bonds whose face amounts totalled $155,000, in return for monthly interest.

3. The securities which were pledged to secure the Claimants'[2] Secured Demand Note obligations to the firm and were subsequently sold on or about November 18, 1983 were not traded by Hanover Square for the benefit of the Claimants or maintained in a customer account.

4. The Agreements provided, among other things, that Hanover Square could re-pledge securities which had been pledged with it as SDN collateral, and, in an "event of financial restriction," after making a demand on the Claimants, could sell the SDN collateral to satisfy the principal amount of indebtedness under the Secured Demand Notes.

5. On or about November 16, 1983, Hanover Square declared an "event of financial restriction." It notified the Claimants of that event and of its intent to liquidate the securities pledged as collateral if the principal amounts of the Secured Demand Notes were not paid. On or about November 18, 1983, Hanover Square sold the collateral. The sales realized $249,246.39 on the bonds pledged by Richard and Patricia Ross and $136,518.77 on those pledged by Sylvia Ross.

6. The excesses realized on the sales over the principal amounts of the capital and notes—$29,246.39 in the case of Richard and Patricia Ross and $11,518.77 in the case of Sylvia Ross—should have been paid by Hanover Square to the Claimants.

---

1. This case was originally assigned to Judge Ryan and upon his retirement was reassigned to this court.

2. Although not defined, the "Claimants" was obviously intended by the parties to include all three members of the Ross family.

7. On or about December 6, 1983, a check in the amount of $9,748.80, representing one-third of the excess amount realized on the sale of the bonds over the principal amount of their SDN, was remitted to Richard and Patricia Ross by Hanover Square. Hanover Square also remitted a check in the amount of $3,839.59, one-third of the excess of the amount realized over the principal of her SDN, to Sylvia Ross. However, the checks were dishonored for insufficient funds.

8. On February 29, 1984, the Claimants filed claims against the estate for the excess amounts realized on the sales of the pledged collateral. Thus, Richard and Patricia Ross filed a claim for $29,246.39, while Sylvia Ross filed a claim for $11,518.77. The Claimants denominated themselves as "customers" within the meaning of § 78lll (2) of SIPA with respect to these claims. Section 78fff–3(a) of SIPA provides that "customer claims" may be satisfied from monies advanced to the Trustee by the Securities Investor Protection Corporation.

9. By letter of September 21, 1984, the Trustee informed counsel for the Claimants of his determination that the Claimants were not customers of Hanover Square within the meaning of § 78lll (2) of SIPA with respect to the excess amounts. The Trustee determined that, with respect to such excesses, the Claimants were general creditors of the debtor's estate.

10. On or about October 19, 1984, counsel for the Claimants served Claimants' Opposition to the Trustee's Determinations.

## DISCUSSION

The only issue in this case is whether a person holding a claim against a broker-dealer for the excess proceeds realized by the broker-dealer from its sale of securities pledged by the claimant as collateral for a Secured Demand Note is a "customer" within the meaning of § 78lll(2) of SIPA. Affording customer status confers preferential treatment, allowing the claimant's debt to be satisfied from monies advanced to the trustee by SIPC. *See* 15 U.S.C. § 78fff–3(a). Denied customer status, claimants are entitled only to the distribution ultimately made to general unsecured creditors of the debtor's estate. A look at the history of SIPA is enlightening in analyzing the parties' dispute.

SIPA's enactment was a response to serious and financial problems pervading the securities industry, H.R.Rep. No. 1613, 91st Cong., 2d Sess. 2 (1970) *reprinted in* 1970 U.S.Code Cong. and Ad.News 5254, 5255. The act was designed to

afford protection to public customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations to their public customers.

*SEC. v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (2d Cir.1972). *See also SIPC v. Barbour*, 421 U.S. 412, 414, 95 S.Ct. 1733, 1735, 44 L.Ed.2d 263 (1975); *SIPC v. Morgan, Kennedy & Co. Inc.*, 533 F.2d 1314, 1316 (2d Cir.1975), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976). To implement this goal, SIPC was established; its main function is to liquidate a broker or dealer when customers' assets are in danger. *Morgan, Kennedy*, 533 F.2d at 1316. The purposes of a liquidation under SIPA are

1) delivery of customer name securities to customers and distribution of customer property and net equity claims as promptly as possible after appointment of a trustee,

2) sale or transfer of offices and other productive units of the debtor's business,

3) enforcement of rights of subrogation provided by SIPA, and

4) liquidation of the debtor's business.

*In re MV Securities, Inc.*, 48 B.R. 156, 159 (Bankr.S.D.N.Y.1985); 15 U.S.C. § 78fff(a). To facilitate the first of these enumerated purposes, SIPC may make advances to the trustee and becomes subrogated to the extent of its advances to the customer claims thereby paid; these advances must be repaid before payment of claims of general

unsecured creditors. 15 U.S.C. § 78fff(a); *see also SIPC v. Associated Underwriters, Inc.*, 423 F.Supp. 168, 170–73 (D.Utah 1975). SIPC advances are limited to $500,-000 per customer, no more than $100,000 of which may be based on a claim for cash (as opposed to securities). 15 U.S.C. § 78fff–3(a)(1). Net equity is the dollar amount of the account determined by calculating the liquidation value of all securities positions on the filing date, subtracting any indebtedness of the customer to the debtor on the filing date, and adding any payment of that indebtedness made with approval of the trustee. *MV Securities*, 48 B.R. at 160–61; 15 U.S.C. § 78*lll* (11).

■ SIPA does not protect all creditors of a brokerage firm against all losses in the event of the demise of the firm. *See SEC v. Packer Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir.1974). Instead, SIPA protection extends to each "customer," a statutorily defined term of art. *SIPC v. Wise (In re Stalvey & Associates, Inc.)*, 750 F.2d 464, 468 (5th Cir.1985). In relevant part, that definition is as follows:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to a sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—
>
> (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement or under-

standing, or by operation of law is part of the capital of the debtor or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement or understanding void or voidable in a suit between the claimants and the debtor.

15 U.S.C. § 78*lll* (2) (1978).

■ The cases in this Circuit are uniform in recognizing that in defining the term "customer," Congress intended to protect those who had entrusted cash or securities to their broker/dealers for the purpose of trading and investing. *See SIPC v. Executive Securities Corp.*, 556 F.2d 98, 99 (2d Cir.1977); *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282–83 (2d Cir. 1974); *Morgan Kennedy*, 533 F.2d at 1317. *See also MV Securities*, 48 B.R. at 160; *John Muir & Co.*, 51 B.R. 150 (Bankr.S.D. N.Y.1985). With these cases as a backdrop it is an inescapable conclusion that the claimants here are not customers under SIPA but *lenders* to the Debtor. Securities were pledged as collateral in connection with subordinated loan agreements under which the Claimants received monthly payments of interest. The bonds pledged as collateral under the SDNs were neither traded by Hanover for the benefit of the Claimants nor maintained for the purpose of future trading on the Claimants' behalf. Lenders are simply not a class to be specially protected under SIPA and in fact were expressly excluded from the definition of customer upon the enactment of the 1978 amendments to SIPA.[3]

Prior to the 1978 amendments, the Second Circuit Court of Appeals twice rejected the contentions of lenders of securities to broker-dealers that "customer" status should be afforded them. In *Baroff*, customer status was denied to one who had loaned securities to a broker which the broker then used as collateral for its own borrowing from a bank.

---

**3.** Prior to that time, customers included persons having claims on account of securities held by the debtor "by way of loan of securities by such

persons." 15 U.S.C. § 78fff(c)(2)(A)(ii)(VI)(1970) *amended by* 15 U.S.C. § 78*lll* (2) (1978).

Because *appellant's loan* to the broker-debtor *had no connection with his trading activity in the securities market,* he cannot qualify by virtue thereof as a "customer" entitled to the benefits of the Securities Investor Protection Act.

*Baroff,* 497 F.2d at 284 (emphasis added). Similarly, in *Executive Securities,* secured lenders were denied customer status, the court there stating

the instant loan agreements do not bear the indicia of the fiduciary relationship between a broker and his public customer, but rather the characteristics of, at most, an ordinary debtor-creditor relationship.

556 F.2d at 99, citing *Baroff,* 497 F.2d at 284.

The amendments to the customer definition were intended to codify decisions such as *Baroff* and *Executive Securities.*

The definition of "customer" should include only a person who enjoys the type of fiduciary relationship with the debtor that characterizes customers in general. Recent decisional law is codified in the definition to provide that only securities received "in the ordinary course of [the debtor's] business as a broker or dealer" may form the basis of a customer claim.... Also, the Task Force agreed that customer status should not be extended to lenders of securities to the debtor where such lenders have received either collateral or consideration for their loans. Lenders of securities in such circumstances can reasonably be expected to bear the risk of the failure of the debtor's business.... Accordingly, some language from the current definition was dropped since it has been used by some lenders in an attempt to gain for themselves the preferred position of customers.... It is further provided that contributors to capital cannot become customers by avoiding the contracts pursuant to which they have contributed capital.... Whatever their rights may be, it is not appropriate to treat such persons as customers.

1978 S. Hearings at 40–41 (section by section explanation of H.R. 8331 amendments to SIPA) (April 25, 1978).

Claimants argue that this is a case of first impression inasmuch as the courts have never construed the status of an excess claim in ·light of the defined term "customer." Admitting that the principal amounts of their claims under the SDNs are not protected, Claimants urge that the excesses are a type of claim which Congress did not specifically preclude when defining customer. In support, claimants turn to subsection (B) of that definition which specifically excludes customer status to a claim of "any person *to the extent* that such ... claim [is] for cash or securities which by ... agreement ... is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor...." 15 U.S.C. § 78*lll* (2)(B) (emphasis added). Claimants contend that the excesses are not part of the capital of the debtor or subordinated to the claims of creditors.

This argument misses the mark, for claimants attempt to bifurcate their claims into "principal" and "excess" where no such division is warranted. The "to the extent" language appears geared to those situations where a person has a claim arising out of multiple transactions only some of which transactions give rise to customer status. That an excess was realized here on the sale of the securities pledged as collateral for the obligation under the Agreement did not transmute the underlying relationship of the parties from a lender-borrower one into a fiduciary one such as is the hallmark of the "customer"—broker transaction. *See Baroff* 497 F.2d at 284. *Baroff, Executive Securities, In re Weis Securities, Inc.,* 605 F.2d 590 (2d Cir.1978), *cert denied,* 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979) and *SEC v. White & Co.,* 406 F.Supp. 806 (E.D.Mo. 1975), *aff'd* 546 F.2d 789 (8th Cir.1976) all stand for the proposition that *lenders* to a broker-dealer, be they gratuitous or compensated, subordinated or unsubordinated, are not customers of the broker-dealer

within the meaning of SIPA. As the Second Circuit explained in *Baroff*

> Congress was intent [in enacting SIPA] on protecting "the public customers of the firms" and in avoiding "a bailout operation" for others, including those who contributed to the capital of the broker-dealer. There is no reason to think that non-investing, non-trading creditors—or gratuitous lenders acting through pure benevolence, family relationship, or friendship—were to be better off under the Act than capital-contributors.

497 F.2d at 284 (quoting Chairman Bridge of the Securities and Exchange Commission). Equally importantly, in attempting to slip into the shoes of a customer by asserting that subsection (B) of § 78*lll* (2) does not explicitly exclude excesses, Claimants conveniently forget that they must first demonstrate that they are embraced by the general definition of a customer which is found at section 78*lll* (2). And that they cannot do.

To qualify as a customer, the claimant must establish that his claim arises

> 1) on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer;
>
> 2) from or for his security account;
>
> 3) for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting a transfer.

15 U.S.C. § 78*lll* (2).

The first element is satisfied when the claimant entrusts cash or securities to the broker "for some purpose connected with participation in the securities market." *Baroff*, 497 F.2d at 283; *see In re SSIW Corp.*, 7 B.R. 735, 739 (Bankr.S.D.N.Y. 1980); *SEC v. Kenneth Bove & Co.*, 378 F.Supp. 697, 700 (S.D.N.Y.1974); *In re Atkeison*, 446 F.Supp. 844, 847 (M.D.Tenn. 1977). The claimant must be a "trading" or "public" customer who tenders his securities for the purpose of having them traded for his account by the broker. *Morgan, Kennedy*, 533 F.2d at 1317; *Stalvey*, 750 F.2d at 472; *MV Securities*, 48 B.R. at 160. Here, the bonds were not delivered for the purpose of having a market transaction performed but to serve as collateral for the Claimants' subordinated loan agreements under which the Claimants would receive monthly payments of interest. Proceeds of the bonds would be applied in reduction of the debt, not credited to a customer account.

No customer security accounts were created for the claimants which would satisfy the second element. Rather than putting the excess into customer accounts for trading, the Debtor unsuccessfully tried to return a portion of the proceeds of the collateral to the Claimants. Were the lack of a customer account which should have been established the only flaw otherwise prohibiting the Claimants from attaining customer status, the court might well find customer status by following the rationale in *SEC v. Ambassador Church Finance/Development Group, Inc.*, 679 F.2d 608 (6th Cir. 1982), much touted by Claimants, where the court stated:

> The appellants make much of the fact that [the broker/dealer] did not maintain a customer account in the name of the church and did not charge or commission for selling the incentive bonds. It is not likely that Congress, in seeking to protect the assets of small transaction customers of broker-dealers, intended to make eligibility for protection depend on whether the broker complied with the rules of the SEC or practices of the trade. These are matters over which the broker has complete control. The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made.

679 F.2d at 614. But here, no showing was made that the Debtor neglected to open a customer account. And in *Ambassador Church* trading activities were clearly involved.

As to the third element, the bonds were not delivered for any purpose contemplated under SIPA. To be tendered for safe-keeping or as collateral, the securities must have been delivered in connection with some market transaction either completed or contemplated for the customer's account. *See John Muir*, 51 B.R. at 152–53. And here, no market transaction was ever contemplated for the Claimants' account; rather, the bonds were pledged to secure Claimants' obligations to the Debtor.

■ Finally, the Claimants argue that the excess proceeds should be considered part of the "free credit balance," or cash over which the customer maintains control to withdraw or demand at any time and which the broker cannot use in connection with his business.[4] *See* 17 C.F.R. §§ 240.-15c 3–2 and 240.15c 3–3(a)(8). Claimants seek a declaration that the excesses are free credit balances because SIPA was intended to protect persons who had entrusted cash or securities to their brokers for the purposes of trading and investing, and "cash" included free credit balances. *See In re Atkeison*, 446 F.Supp. 844, *supra*, (M.D.Tenn.1977). Since, the argument runs, free credit balances are debts owed to "customers" as "customer" is defined in the applicable SEC regulation found at 17 C.F.R. § 240.15c 3–2, and since free credit balances are included as cash under SIPA, Claimants should be deemed "customers" under SIPA. But because one is arguably embraced by the definition of "customer" in a regulation whose underlying purpose is somewhat different from SIPA does not mean that one is thereby converted into a customer under SIPA. Under SIPA § 78*lll* (2), to be a "customer" as a result of cash deposited with the broker, the person claiming customer status must still show that the cash was "deposited ... with the debtor for the purpose of purchasing securities." And that Claimants have failed to do. Moreover, the excesses due Claimants

here are not free credit balances in any event.

Free credit balances "are funds left with a broker-dealer firm by customers who have an unrestricted right to withdraw them on demand. This money ... is left on deposit with the broker largely as a matter of convenience." H.Rep. No. 91–1613, 91st Cong., 2d Sess., reprinted in [1970] U.S. Code Cong. and Admin.News 5254 at 5255. Such accounts typically arise in four situations:

> First, the customer may have deposited cash with his broker-dealer in anticipation of making a purchase. Secondly, the broker-dealer may have retained the cash proceeds from the sale of a customer's securities, either on express instructions from the customer or because the customer has failed to give instructions for the deposition [sic] of the proceeds. Thirdly, the broker-dealer may have retained interest or dividends that have been paid on a customer's securities that the broker-dealer holds in street name. Finally, a margin customer [one who buys securities on credit collateralized with a "margin" amount] may have deposited cash with a broker-dealer in excess of margin requirements.

*Atkeison, supra,* 446 F.Supp. at 847 quoting Note, *The Securities Investor Protection Act of 1970: A New Federal Role in Investor Protection,* 24 Vand.L.Rev. 586, 587–88 (1971).

The Claimants collateralized the subordinated loans with *all* of the bonds. While the loans were outstanding, no portion of the collateral was immediately payable in cash to the Claimants on demand, as required under the free credit balance definition. Rather, under the Agreements, the Claimants' rights and interest in the collateral were at all times "[s]ubject ... to the prior rights of [Hanover's predecessor] as pledgee hereunder and under the Note, un-

---

**4.** Specifically, "free credit balance" is defined in securities laws as

> (8) The term "free credit balances" shall mean liabilities of a broker or dealer to customers which are subject to immediate cash

payment to customers on demand, whether resulting from sales of securities, dividends, interest, deposits or otherwise....

17 C.F.R. § 240.15c 3–23(a)(8) (1984).

til liquidated ...'' Agreements, ¶ IV(a). Significantly, although Claimants could under the agreements (if the debtor was in compliance with its net capital requirements) direct the sale of the securities posted as collateral, the net proceeds of any such sale had to be held by the *Debtor* as collateral. Agreements ¶ IV(b). And although the Claimants could withdraw collateral (if the value of the remaining collateral was sufficient), this right, too, was subject to the prior rights of the Debtor. Agreements ¶ IV(c). Absent satisfaction of the stipulated conditions, the entire value of the collateral had to remain with the Debtor and was made subject to the risks of the Debtor's business. The language of the Agreements compels this court to conclude that the excess funds were not free credit balances.[5]

CONCLUSION:

From whatever door claimants attempt to enter, they reach the room reserved for lenders. Similar efforts to expansively read the definition of "customer" have consistently failed. *See, e.g., Stalvey,* 750 F.2d at 472 stating "judicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provision;" *Morgan, Kennedy,* 533 F.2d at 1317, stating "[e]mphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit;" *John Muir,* 51 B.R. at 152; *MV Securities,* 48 B.R. at 160. Accordingly, we can only conclude that the Claimants here are not customers as defined by 15 U.S.C. § 78*lll* (2).

In light of the judicial gloss, the Trustee's motion to affirm his decision denying customer status to the Claimants is granted.

IT IS SO ORDERED.

---

**5.** The actions of the Claimants are consistent with this interpretation. Since when the collateral was actually liquidated, the Claimants tried to withdraw the excess proceeds, they obviously did not intend to leave the money with the Debtor for the purpose of having securities purchased for them in the future. (*See* Affidavit of Steven G. Storch, Esq. at ¶ 2.) Moreover, it appears that the Claimants intended that their securities would be used by the Debtor in the course of its business, particularly, to enable it to meet its net capital requirements. They contracted to allow all their collateral to be used (and be thereby put at risk) in exchange for their monthly receipt of interest payments equal at year's end to 10% of the principal amount of the SDNs. (Ross Memorandum of Law at pp. 2–3.) There is no indication in the record that Claimants intended to have free credit balances within the meaning of the applicable regulation.