**In re ADLER COLEMAN CLEARING CORP., Debtor.**

**Bankruptcy No. 95 B 08203 (JLG).**

United States Bankruptcy Court, S.D. New York.

Jan. 7, 1997.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Edwin B. Mishkin as SIPA Trustee.

Kittay, Gold & Krebsbach, P.C., White Plains, New York, for Claimants.

Kenneth J. Caputo, Associate General Counsel, Washington, DC, for SIPC.

### MEMORANDUM DECISION ON TRUSTEE'S MOTION FOR ORDER UPHOLDING TRUSTEE'S DETERMINATIONS DENYING THREE CLAIMS FOR DEPOSIT ACCOUNTS AND EXPUNGING OBJECTIONS WITH RESPECT TO THOSE DETERMINATIONS

JAMES L. GARRITY, Jr., Bankruptcy Judge.

Edwin Mishkin, Esq., as the court-appointed Securities Investor Protection Act ("SIPA") trustee for the liquidation of the business of Adler Coleman Clearing Corp. ("Adler Coleman" or the "debtor"), seeks an order upholding his denial of SIPA "customer claims" asserted on behalf of the Partnership (as defined below), and by Wulff, Hansen and Company ("Wulff Hansen", and with the Partnership, the "Claimants") because they are not "customers" and the net equity in their Deposit Accounts (as defined below) is not "customer property" under SIPA. We grant the Trustee's motion.

### Facts

The background facts are not in dispute. Ash & Company Inc. ("Ash") and Lek, Schoenau & Company, Inc. ("LSC") are registered broker-dealers. Wulff Hansen is a broker-dealer and a self-clearing member of the Depository Trust Company of New York and National Association of Securities Dealers. On May 3, 1993, Ash, LSC and two California securities traders, Michael J. McHale and Scott A. McFarland, entered into a partnership agreement (the "Partnership Agreement") to conduct retail securities transactions in California. That partnership (the "Partnership") is not a registered broker-dealer. Ash and LSC contributed $25,000 in cash and AT & T bonds, respectively, to the Partnership. That day, the Partnership and Adler Coleman executed a Customer Agreement and Ash and Adler Coleman simultaneously executed a fully disclosed clearing agreement (the "Ash Clearing Agreement"). The Partnership also opened a deposit account (the "Partnership Deposit Account") with Adler Coleman and funded it with the $50,000 in cash and securities contributed to the Partnership by Ash and LSC. Finally, that day, Wulff Hansen opened a Special Omnibus Account (the "Omnibus Account") pursuant to a Special Omnibus Account Agreement (the "Omnibus Account Agreement") with Adler Coleman.

On or about June 28, 1996, Wulff Hansen, as an introducing broker, executed a fully disclosed clearing agreement with the debtor having identical terms to Ash's clearing agreement (the "Wulff Hansen Clearing Agreement", with the Ash Clearing Agreement, the "Clearing Agreements"). It also opened a deposit account with Adler Coleman (the "Wulff Hansen Deposit Account", with the Partnership Deposit Account, the "Deposit Accounts") and funded it with a $25,000 U.S. Treasury Note.

Adler Coleman was a member of the Securities Investor Protection Corporation ("SIPC") and a broker registered with the

Securities and Exchange Commission ("SEC"). On February 27 1995 (the "filing date") the Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, entered an order pursuant to § 5(b) of SIPA, 15 U.S.C. § 78eee(b), finding among other things, that debtor's customers required SIPA protection, appointing the Trustee to liquidate Adler Coleman, and removing the liquidation proceeding to this court.

On March 20 and May 18, 1995, respectively, Wulff Hansen and the Partnership filed SIPA customer claims to recover the net equity in their Deposit Accounts. Pursuant to identical notices dated November 3, 1995 (the "November 3 Notices"), the Trustee denied those claims. In relevant part, the notices state:

> You have claimed assets which, pursuant to a clearing agreement with [debtor], were deposited into an account designated as a "Deposit Account". The equity you were required to maintain in the Deposit Account is part of the general estate of the Debtor and is not "customer property". The Trustee does, however, recognize your claim for the assets in the Deposit Account as a general unsecured claim.... *This determination is limited to the claim you have submitted for assets held in the Deposit Account. It does not constitute a determination of any additional claim you may have filed for other assets held in different accounts.*

(Emphasis added). The Partnership and Wulff Hansen timely objected to those determinations.

### Discussion

■ SIPA protects customers of registered broker-dealers who entrust those broker-dealers with cash or securities in the ordinary course of business. *Matter of Ober-*

*weis Securities, Inc.,* 135 B.R. 842, 845 (Bankr.N.D.Ill.1991). A person whose claim against the debtor qualifies as a "customer claim" receives preferential treatment in the distribution of assets from the debtor's estate. Claimants with valid customer claims share in the fund of "customer property" to the extent of their "net equity". The latter is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor with all the securities and cash balances valued as of the filing date. *See* SIPA §§ 78*lll*(11) (defining "net equity"), 78*lll*(7) (defining "filing date"). The Trustee distributes "customer property" exclusively among debtor's customers, on a pro rata basis determined to the extent of each customer's net equities. *See* SIPA § 78fff–2(c)(1). Congress authorized SIPC to advance funds to the Trustee to pay up to $500,000 to each holder of a valid customer claim, with a maximum of $100,000 for the cash portion of that claim, to the extent the customer's pro rata share of customer property does not fully satisfy the customer's net equity claim. *See* SIPA § 78fff–3(a). The debtor pays the claims of those creditors who do not qualify as "customers" from the assets in its general estate. *See* SIPA § 78fff–2(c)(1)(B). *See generally SIPC v. Wise (In re Stalvey & Associates, Inc.),* 750 F.2d 464, 468 (5th Cir.1985) ("*Stalvey*"); *In re Hanover Square Sec.,* 55 B.R. 235, 237 (Bankr. S.D.N.Y.1985).

■ The Claimants argue that the Trustee erred in denying their claims because they are SIPA customers and the net equity in the Deposit Accounts is customer property.[1] Citing a handbook issued by SIPC and entitled "How SIPC Protects You: Questions and Answers about SIPC" (the "Handbook"), they contend that the Trustee

---

1. Under SIPA, a "customer" is

   any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to a sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.... The term "customer" includes any person who has a claim against the debtor

   arising out of sales or conversion of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities....

   15 U.S.C. § 78*lll*(2). "Customer Property" consists of

   cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer....

   15 U.S.C. § 78*lll*(4).

failed to meet his burden of proving otherwise.

In relevant part, the Handbook states:

SIPC presumes that cash balances are left in securities accounts for the purpose of purchasing securities. It would require substantial evidence to the contrary to overcome this presumption. Standing alone, the fact that a cash balance was earning interest and was not used to purchase securities for a considerable period of time, say several months, would not be sufficient to overcome the presumption.

Handbook at 6. The Trustee denies that he must disprove the Claimants' allegations, contending instead that the Claimants must prove they are entitled to SIPA protection. SIPC urges that the quoted passage merely represents how SIPC and the Trustee view cash deposits in securities accounts at SIPC member broker-dealers but that it is inapposite because the Deposit Accounts are not securities accounts. The Trustee and SIPC are correct that the Claimants must prove that they are "customers" and that the equity in the Deposit Accounts is "customer property" under SIPA. *See Jackman v. SIPC (In re Brentwood Sec., Inc.),* 96 B.R. 1002, 1006–07 (9th Cir. BAP 1989); *SIPC v. C.J. Wright & Co., Inc. (In re C.J. Wright & Co.),* 162 B.R. 597, 605 (Bankr.M.D.Fla.1983). To do so, they must show both that they meet SIPA's definition of customer and that they entrusted their assets to debtor as a broker-dealer to trade them in the securities market. *See SEC v. F.O. Baroff Co., Inc.,* 497 F.2d 280, 282–83 (2d Cir.1974) (*"F.O. Baroff"*) (claimant fitting literal definition of customer not accorded SIPA protection because it did not entrust assets to broker-dealer for purpose of trading); *SIPC v. Executive Securities Corp.,* 556 F.2d 98, 99 (2d Cir.1977) (rejecting literal application of SIPA definition of customer to claimant who lent securities to broker-dealer in return for cash collateral equal to market value of shares whereby each party retained right to demand additional cash if market value increased or of collateral if market value decreased) (citing *F.O. Baroff*); *In re SSIW Corp.,* 7 B.R. 735, 739–40 (Bankr.S.D.N.Y. 1980) (claimant not accorded SIPA protection because it did not entrust money to broker-dealer in connection with a securities transaction, rather claimant held unexecuted "put" options granted by debtor). *See also SIPC v. Morgan, Kennedy & Co., Inc.,* 533 F.2d 1314, 1317 (2d Cir.) (*"Morgan, Kennedy"*) ("Emphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit.") (citations omitted), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976); *In re MV Securities, Inc.,* 48 B.R. 156, 160 (Bankr.S.D.N.Y. 1985) (same); *In re John Muir & Co.,* 51 B.R. 150, 152–53 (Bankr.S.D.N.Y.1985) (same).

█ The Trustee contends, and the Claimants do not dispute, that the cash in the Deposit Accounts is not SIPA customer property because, as discussed below, it did not "aris[e] out of sales or conversion of … securities", and it was not deposited "for purposes of purchasing securities". *See* SIPA § 78*lll*(2); *In re Omni Mutual Inc.,* 193 B.R. 678, 681 (S.D.N.Y.1996) (denying customer status to investor who paid cash to broker-dealer and received interest in limited partnership). As we explain below, the Claimants failed to prove that they have valid customer claims for the cash or securities in the Deposit Accounts. Moreover, the Trustee has shown that the Claimants are not entitled to preferred status under SIPA.

█ The Partnership and Wulff Hansen plainly were customers of Adler Coleman in the vernacular sense because they maintained the Customer and Omnibus Accounts, respectively, with debtor. It does not follow, however, that their claims merit preferred treatment under SIPA. The term "customer" is a statutorily defined term of art that "is an integral part of a comprehensive statutory scheme governing the rights of creditors and brokers. It is not used in the colloquial sense of 'one who buys or trades.' " *Stalvey,* 750 F.2d at 468 (footnote omitted); *see also In re Hanover Square Securities,* 55 B.R. at 238 (citing *Stalvey* ). By design, SIPA focuses on the specific securities or transactions that are the subject of a claim. *Stalvey,* 750 F.2d at 471. Thus, a party can be a SIPA customer regarding certain accounts but not others. *See F.O. Baroff,* 497 F.2d at 282 n. 2

("The Act contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to other [sic]. This is made explicit in the definition of 'cash customer', but it is also implicit in the general pattern of the legislation and fits with the use of the plural in the definition of 'customers' as '... persons ... who have claims on account of securities received, acquired, or held by the debtor ....'") (citation omitted); *Stalvey*, 750 F.2d at 471 ("[claimant's] customer status in the course of some dealings with a broker will not confer customer status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute."). The Trustee acknowledged that distinction in his November 3 Notice (quoted above) by focusing only on the Deposit Accounts and expressly excepting claims for assets in any other accounts maintained by the Claimants.

Under the Clearing Agreements, debtor agreed to carry the cash and margin accounts introduced by Ash and Wulff Hansen, acting as their agents and at their instructions, and to clear and settle transactions on a fully disclosed basis for their customers' accounts. Clearing Agreements ¶¶ 1, 3. Debtor also collected commissions for Ash and Wulff Hansen charging whatever they directed it to charge for each transaction. *Id.* ¶ 9. In essence, Ash and Wulff Hansen agreed to supervise the accounts of the customers they introduced and to indemnify the debtor, inter alia, for any and all loses, liabilities and expenses suffered due to debtor's clearing activities for them or their customers' accounts. *Id.* ¶¶ 5–8. Under the Clearing Agreements, Ash and Wulff Hansen (as "Introducing Firms") had to establish "Deposit Accounts", as follows:

(a) To further assure the Introducing Firm's performance of its obligations hereunder, .... the Introducing Firm shall ... establish an account with [Adler Coleman] to be designated as the Introducing Firm's "Deposit Account." The Deposit Account shall at all times contain cash or securities (or both) having a market value equal to or in excess of the minimum amount required under Exhibit A (the "Minimum Amount"). Such securities shall consist only of direct

obligations issued by or guaranteed as to principal and interest by the United States of America. The Introducing Firm may from time to time direct the investment of the cash in the Deposit Account, but no purchases shall be made on margin and securities purchased shall consist only of such direct obligations. The Deposit Account shall not be deemed to be margin for any of the Introducing Firm's Accounts and shall not in any way constitute an ownership interest in the Clearing Agent. The Introducing Firm shall be paid interest on the cash (but not on the securities) in the Deposit Account at the rate of 2% below the broker's call rate.

*Id.* ¶ 8(a). The Trustee and SIPC contend that the Clearing Agreements govern Claimants' rights to the net equity in the Deposit Accounts. Since Claimants opened those accounts to secure the obligations under the Clearing Agreements, and not to serve as securities or trading accounts, the Trustee urges that the Claimants are not SIPA customers and the net equity in the Deposit Accounts is not customer property.

The Claimants dispute that assertion, contending, in essence, that the Deposit Accounts either are trading or margin accounts. The Partnership argues that the Customer Agreement—not the Clearing Agreement—governs its relationship with debtor and that under that agreement, the account's net equity is SIPA customer property. The Partnership argues that it entrusted the funds to debtor under the Customer Agreement for "some purpose connected to the securities market" because the agreement states:

In consideration of [debtor] accepting on or more accounts of the undersigned (whether designated by name, number or otherwise) and agreeing to act as carrying broker for the undersigned in connection with *effecting transaction in securities and other property* ....

Customer Agreement at 2 (emphasis added). As support, Claimants point out that the headline on the first and second page of the Customer Agreement is marked with the words **"CUSTOMER ACCOUNT"** in capital letters and bold typeface and that the fine

print located just above the signature line of the agreement states: "By signing this application I acknowledge that I have read, understand and agree to the terms of the following Customer Agreement". The Partnership also contends that the Ash Clearing Agreement is not controlling because only Ash, not the Partnership, executed it.

The partners formed the Partnership to "deal with commission income business which will be generated by the [General Securities Representatives], the capital invested by Ash and LSC and their respective responsibilities as described [in the agreement]". *See* Partnership Agreement at 1. In relevant part, the agreement describes the "Responsibilities of Parties" as follows:

> Ash and LSC will each invest $25,000 which will be held by Adler, Coleman & Co., Inc., a member of the New York Stock Exchange, who is in the business of clearing securities transactions ("Clearing Firm"). The investment will be in cash or in the form of marketable securities with a value of at least $25,000.00. *The funds will be held by the Clearing Firm in a joint account for LSC and Ash and serve as collateral for the benefit of the Clearing Firm to protect it against liability and/or losses that it may incur as a result of its dealings with customers introduced by Ash through the efforts of the [General Securities Representatives]. The funds will not be used as collateral for any other purpose. Specifically, the funds will not be held as margin for principal transactions. In other words, the account will not be used for trading other than to invest the funds periodically to obtain a reasonable rate of return in a non-speculative manner.*

> \*    \*    \*    \*    \*    \*

> Ash will be responsible for the day to day activities of running the business, including execution of orders in listed securities and market making in securities which are traded over the counter. As such, Ash will serve as the primary contact with the [General Securities Representatives] and the Clearing Firm. LSC will be responsible for record keeping, legal and general supervisory work as well as for general

planning and expansion of the business. In addition, LSC will provide automated execution services through the development of an interface with the NYSE's DOT system and through other means.

*Id.* at 1–2 (emphasis added). In executing its clearing agreement, Ash gave effect to the Partnership Agreement. Likewise, under that agreement Ash and LSC had to open the Partnership Deposit Account to enable Ash, as the Partnership's introducing broker, to clear transactions through the debtor. The Customer Account and underlying Customer Agreement do not bear on the Partnership's rights in the Deposit Accounts. The Customer Agreement merely regulates the relationship between the Partnership, as customer, and the debtor as its broker. It does not make the Partnership a customer for SIPA purposes. Neither the Customer Account nor the Customer Agreement calls for the Partnership to open a deposit account. That obligation exists by virtue of the Partnership and Ash Clearing Agreements. Under these circumstances, it is immaterial that only Ash executed the clearing agreement. That agreement, not the Customer Agreement, controls the parties' rights to the net equity in the Partnership Deposit Account.

Wulff Hansen urges that the Omnibus Account Agreement, not the Wulff Hansen Clearing Agreement, governs its right to recover the net equity in its Deposit Account. Wulff Hansen entered into the Omnibus Account Agreement to carry securities or short sales for the account of its customers. *See* Omnibus Account Agreement ¶ 3. Wulff Hansen correctly notes that the bottom of a randomly selected monthly account statement bears the legend: "[a]ll *Customer* Accounts are insured up to $2,500,000" (emphasis added), and the Trustee does not deny that debtor assigned an account executive to the account. The Trustee acknowledges that many brokers with similar Omnibus Account Agreements posted good faith deposits to protect the debtor, and Wulff Hansen's Deposit Account may in fact have served that function for trades executed through the Omnibus Account. However, he is correct that the Omnibus Account on its face does not

require a deposit account or refer in any way to the purposes of such an account. Indeed, Wulff Hansen filed a separate customer claim for the securities held in the Omnibus Account. *See* Affidavit of Stephanie H. Roth, Esq., submitted in support of the Trustee's motion ("Roth Affidavit"), at Ex. B. The Trustee released the contents of that account based on Wulff Hansen's proof that the securities therein were held for the benefit of customers, not broker-dealers. *See* 78fff–3(a)(5) (broker-dealer may recover funds that "arose out of transactions for customers of such broker-dealer"). Although the Claimants deny that Wulff Hansen ever used debtor's clearing services, the uncontested evidence proves otherwise. *See* Roth Affidavit, Ex. C (copies of account statements for two of the accounts for which Wulff Hansen acted as an introducing broker). In any event, it is irrelevant whether Wulff Hansen did so. Adler Coleman required Wulff Hansen to open the Wulff Hansen Deposit Account as a condition of its agreement to clear Wulff Hansen's customers' trades. *See* Clearing Agreement ¶ 8(a). The Wulff Hansen Clearing Agreement controls Wulff Hansen's right to the equity in its Deposit Account.

The Claimants misplace their reliance on *In re C.J. Wright & Co., Inc.,* 162 B.R. 597. There the claimants entrusted funds to the debtor to purchase "Deposit Accounts" which the court found essentially to be certificates of deposit ("CDs"). The court held that the claimants had valid customer claims because they had established that they entrusted money to the debtor for the purpose of purchasing securities (i.e., the CDs) and, based on all the circumstances, the transaction contained "the indicia of the usual fiduciary relationship between a broker and his public customer, not the characteristics of, at most, an ordinary debtor-creditor relationship". *Id.* at 608–609. The Deposit Accounts at issue in *Wright*—which essentially are CDs—are nothing like those at issue in this case. Here, the accounts were established under the Clearing Agreements to secure the Claimants' obligations under those agreements. There is no indicia of the usual fiduciary relationship between a broker and public customer which would give rise to a customer claim. *Wright* is inapposite and does not support the Claimants' objections.

The Claimants urge that even under the Clearing Agreements the Deposit Accounts are "securities accounts", i.e., trading accounts, because those agreements state that

> [t]he Introducing Firm may from time to time direct the investment of cash in the Deposit Account, but no purchases shall be made on margin and securities purchased shall consist only of such direct obligations....

Clearing Agreements ¶ 8(a). They also note that under the Customer Agreement the Partners opened a cash account emphasizing safe investments and requiring that all dividends, interest and cash proceeds be held in the account for reinvestment, and that the Partnership Agreement states that the Partnership Deposit Account will be used "to invest the funds periodically to obtain a reasonable rate of return in a non-speculative manner". *See* Partnership Agreement at 1; Clearing Agreements ¶ 8(a) ("The Introducing Firm may from time to time direct the investment of the cash in the Deposit Account, but no purchases shall be made on margin and securities purchased shall consist only of ... direct obligations [issued by or guaranteed as to principal and interest by the United States of America]").

■ SIPA protects customers "with 'an unrestricted right to receive on demand the securities which belong to them'". *In re Weis Securities,* 1977 WL 1043, *4 (S.D.N.Y. 1977) (quoting H.R.REP. No. 91–1613, 91st Cong.2d Sess. (1970)). The Claimants clearly lacked that right because the Clearing Agreements mandate that the accounts be funded at certain minimum amounts and remain open and funded up to and beyond the termination of the agreements. *See* Clearing Agreements ¶ 8(b) (stating that the introducing broker is obligated to maintain cash or securities in the Deposit Account equal to at least the Minimum Amount in the event the debtor withdraws assets from the account), (c) (providing that after termination of the agreement, debtor may retain in the Deposit Account amounts it deems necessary for its protection from any claim or proceeding until the final determination of such claim or pro-

ceeding). Moreover, the permitted investment under the Clearing Agreements plainly was intended to maintain the Deposit Accounts so that they could be used to cover the debtor's losses, and not to produce returns for Ash, Wulff Hansen, or their customers. The Partnership cannot contend otherwise because the Partnership Agreement states that the Deposit Account "will not be used for trading other than to invest ... periodically to obtain a reasonable rate of return in a non-speculative manner". *See* Partnership Agreement at 1. Neither Deposit Account is a customer account under SIPA § 78*lll*(2). *See In re Weis Securities,* 1977 WL 1043, *4 (mere fact that trading was permitted in subject accounts did not make them trading accounts because agreements imposed severe restrictions on trading and accounts were clearly established for the purpose of satisfying creditors' claims). *See, e.g., In re Hanover Square Securities,* 55 B.R. at 240 (no security account created where debtor tried to return portion of proceeds of collateral to Claimants rather than putting excess into customer accounts for trading); *In re John Muir & Co.,* 51 B.R. at 153 ("borrowing of securities from one broker by another to cover a short sale by the latter's customer did not open the type of account sought to be protected by the grant of customer status under SIPA since the loan was 'not incidental to an existing investment or trading account with the debtor' ") (quoting *SIPC v. Executive Securities,* 423 F.Supp. 94, 96 (Bankr.S.D.N.Y.1976), *aff'd,* 556 F.2d 98 (2d Cir.1977)). For the same reasons, the securities in the Deposit Accounts were not held with "a view to sale", "to cover consummated sales" or "for purposes of effecting a transfer" as required by SIPA § 78*lll*(2).

■ The Claimants argue that the Deposit Accounts are "collateral" under SIPA § 78*lll*(2) because pursuant to ¶¶ 7 and 8 of the Clearing Agreements, they can use the funds in the accounts to cover margin calls. Paragraph 7 provides that

> the Introducing Firm agrees to indemnify the Clearing Agent for and to defend, and hold the Clearing Agent harmless from and against all claims, demands, proceed-

ings, suits, actions, liabilities, out of one or more of the following:

> \* \* \* \* \* \*

> (ii) The failure of an Introduced Account to meet any initial margin call or any maintenance call. . . .

Clearing Agreements ¶ 7(ii). Paragraph 8 states that the Deposit Account is established "[t]o further assure the Introducing Firm's performance of its obligations ... including, but not limited to, its obligations under Paragraph 7. . . ." Clearing Agreements ¶ 8(a).

The Deposit Accounts collateralized Ash and Wulff Hansen's liability for any losses covered by the clearing arrangements. Those liabilities include, without limitation, the failure to comply with any of the registration, reporting or other requirements of appropriate securities exchanges and regulatory bodies (Clearing Agreements ¶ 2(ii)), any dishonest, fraudulent or criminal behavior by an employee, agent or customer of the Introducing Broker (*Id.* ¶ 7(iv)), attorney fees and other collection costs incurred by the clearing firm in collecting on unpaid debts of the Introducing Brokers or their customers (*Id.* ¶ 7(x)) and the Introducing Brokers' failure to pay for services provided by the clearing firm (*Id.* ¶¶ 10(a)–(b)).

■ As used in § 78*lll*(2), the term "collateral" refers to securities left with the broker to cover the purchaser's margin purchases. *See Stalvey,* 750 F.2d at 472; *Baroff,* 497 F.2d at 284. *See also Hearings on H.R. 18081, 13308, 17585, 18109 & 18458 Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 2d Sess. 228 (1970) (Statement of Mr. P.A. Loomis, General Counsel, Securities and Exchange Commission) (noting that SIPA and the concept of customer status were meant to protect, among other things, "customers who buy securities on margin ... [whose] securities are necessarily left with the broker-dealer and used as collateral for the margin loan".) *Cf. Appleton v. First Nat'l Bank,* 62 F.3d 791, 801 (6th Cir.1995) (interpreting the term "cash" as used in § 89*lll*(2) in keeping with legislative purpose where "cash" was not defined in SIPA). Regulation T, the SEC rule

governing the issuance of credit by brokers, defines "margin call" as "a demand by a creditor to a customer for a deposit of additional cash or securities to eliminate or reduce a margin deficiency." Credit By Brokers And Dealers (Regulation T), 12 C.F.R. § 220.2 (1996). While the Deposit Accounts may be used to indemnify the debtor for margin calls from the Claimants' other accounts, that is different from permitting the assets in the accounts to be used as collateral security for margin transactions of the introducing brokers or their customers. The Clearing and Partnership Agreements expressly forbid the latter. *See* Clearing Agreements ¶ 8(a) ("The Introducing Firm may from time to time direct the investment of the cash in the Deposit Account, but no purchases shall be made on margin and securities purchased shall consist only of such direct obligations); Partnership Agreement at 1 ("Specifically, the funds will not be held as margin for principal transactions."). In enacting SIPA, Congress sought to give priority to claims arising out of the relationship between a broker-dealer and customer who, as a would-be investor, entrusted cash or securities with a broker-dealer. The relationship between introducing brokers and their clearing agent falls outside the statute.

■ Claimants state that the assets in the Deposit Accounts could have been delivered to the debtor for safekeeping because they were delivered in connection with a market transaction. "Safekeeping" is a term of art. *See Stalvey*, 750 F.2d at 472. In brokerage houses, "safekeeping" securities are those that are fully paid for and held in custody by the broker. *Id.* (citing H.R.REP. No. 1613, 91st Cong., 2d Sess. 2 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5256). The Claimants did not deliver the relevant securities for "safekeeping" under SIPA.

The evidence conclusively shows that the Deposit Accounts are neither trading nor margin accounts because they were established to serve as collateral under the Clearing Agreements. Accordingly, the Claimants are not SIPA customers and the net equity in the Deposit Accounts is not customer property. *See F.O. Baroff*, 497 F.2d at 284 (where there was "no actual or likely use of the

shares as collateral for margin purchases . . . of other securities; nor were the [assets on deposit] used to facilitate securities trading", account was not a "customer account"); *Stalvey*, 750 F.2d at 472 ("The statutory scheme envisioned by the drafters of the statute was to protect persons buying and selling securities through a stockbroker, not to compensate a person who turned over his securities to a bank as collateral for a loan . . . .") (citing H.R.REP. No. 1613, 91st Cong, 2d Sess. 1–3 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5254, 5254–56); *SIPC v. Executive Securities, Inc.*, 556 F.2d at 99 (denying customer status to claimants who lent securities to debtor as secured creditors and not as investors); *In re Weis Securities, Inc.*, 1977 WL 1043 *4 (denying SIPA protection to accounts which were not created for claimants' benefit through trading activity in the securities market).

■ In its objection to the Trustee's determination of its claim (the "Wulff Hansen Objection"), Wulff Hansen argues that the Treasury Note in its Deposit Account is a "customer name security" which the Trustee must turn over under SIPA § 78fff–2(c)(2) ("[t]he trustee shall deliver customer name securities to or on behalf of a customer of the debtor entitled thereto . . . ."). "Customer name securities" are

securities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor . . .

15 U.S.C. § 78*lll*(3).

Wulff Hansen contends that the Treasury Note is "registered in the name of Wulff Hansen and is deposited into an account with the name of Wulff Hansen." Wulff Hansen Objection ¶ 8. It argues that there is no broker-dealer exclusion with respect to customer name securities that would preclude Wulff Hansen from recovering under SIPA § 78*lll*(3) and that SIPA § 78fff–3(a)(5), which provides that no SIPC advance shall be made to pay a net equity claim of a customer who is a broker or dealer, is irrelevant because Wulff Hansen does not have a

net equity claim. *Id.* The Trustee argues that the Treasury Note is registered pursuant to the book entry system commonly used for widely held securities. He asserts that there is no certificate representing the note bearing Wulff Hansen's name, so it is not a "customer name security".

The note is not a "customer name security" within the meaning of the statute because it was held in debtor's name and was not registered in Wulff Hansen's name. *See* Affidavit of Richard M. Winn, submitted in support of the Trustee ¶¶ 4, 7. Even assuming that the note was registered in Wulff Hansen's name, it cannot be a "customer name security" because, as explained above, Wulff Hansen is not a SIPA "customer". SIPA § 78*lll*(3). We find no merit to Wulff Hansen's argument that it may recover the note as a customer name security registered in its own name because SIPA § 78*lll*(3) does not exclude brokers from recovering customer name securities. A broker acting on its own account cannot be a customer under SIPA § 78*lll*(2). *See* 15 U.S.C. § 78*lll*(2) (defining customer); *id.* § 78fff–3(a)(5) ("no advance shall be made by SIPC to the trustee to pay ... any net equity claim of any customer who is a broker or dealer or bank, other than to the extent ... that the net equity claim of such broker or dealer or bank against the debtor arose out of transactions for customers of such broker or dealer or bank"). *See also SEC v. Packer, Wilbur & Co., Inc.,* 498 F.2d 978, 984 (2d Cir.1974) (objective of SIPA was to protect members of the investing public, not brokers" and " 'the term 'customer' means any person other than a broker or dealer' "). For this reason, Wulff Hansen would not be entitled to recover the note as a customer name security even if it had registered the note in its own name.

During the argument of the motion, the Claimants contended for the first time that there will be a chilling effect on the securities market if we determine that the Deposit Accounts are not customer property under SIPA because small broker-dealers like Ash and Wulff Hansen will be reluctant to deposit funds with clearing firms. They urge that such a result will undermine SIPA's policy of encouraging investment in the securities markets. The Claimants adduced no evidence to support that contention. SIPA does not protect all creditors of a brokerage firm against all losses in the event of the firm's demise. *See, e.g., SEC v. Packer, Wilbur & Co.,* 498 F.2d at 983; *Hanover Square,* 55 B.R. at 238. Moreover, it is common for clearing agreements to require introducing firms to indemnify clearing firms for all losses due to customer defaults and to furnish good faith deposits to secure their indemnities in order to protect against the risk of customer default. *See* Henry F. Minnerop, *The Role and Regulation of Clearing Brokers,* 48 Bus.Law. 841, 844 (May, 1993) ("To protect against the risk of customer default, clearing agreements generally require introducing firms to indemnify clearing firms for all losses due to customer defaults and to furnish good faith deposits to secure indemnities.") (footnote omitted). *See also Baratta v. S.D. Cohn & Co.,* 656 F.Supp. 1 (S.D.N.Y.1985) (enforcing indemnification agreement). An introducing broker cannot reasonably expect such a deposit to be treated as a SIPA customer account because the deposit is generally understood to be a device by which the clearing agent shifts, and the introducing broker assumes, risk. *Id.* Part of that risk is that the introducing broker's claim in a SIPA liquidation will not be accorded SIPA priority.

The Claimants also argued for the first time that equity mandates that their claims be allowed as SIPA customer claims because their claims are *de minimis* and because they understand that other broker-dealers received money three days after the debtor collapsed.

> Arguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of ... the bankrupt would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse.

*SEC v. Packer, Wilbur & Co.,* 498 F.2d at 983 (denying customer status to investor who

lost money in attempted violation of margin rules). Likewise, Claimants' argument has no merit. The Claimants are not SIPA customers and the net equity in the Deposit Accounts is not customer property.

### Conclusion

We uphold the Trustee's determinations regarding the Claimants' claims and expunge the Claimants' objections to those determinations.

SETTLE ORDER.