### In re KLEIN, MAUS & SHIRE, INC., Debtor.

### No. 00–8193A (AJG).

United States Bankruptcy Court, S.D. New York.

Oct. 3, 2003.

---

Gibbons, Del Deo, Dolan, Griffinger &
Vecchione, Irving H. Picard, Patrick C.
Dunican, Jr., of Counsel, New York City,

for Irving H. Picard, Trustee Klein, Maus & Shire, Inc.

Torys, David W.R. Wawro, of Counsel, New York City, for Claimants Ronald A. and Jenny Yakin.

Securities Investor Protection Corporation, Stephen P. Harbeck, Josephine Wang, of Counsel, Washington, D.C., In-house Counsel.

### MEMORANDUM DECISION AND ORDER UPHOLDING TRUSTEE'S DETERMINATION DENYING CLAIMS 52 AND 53 OF RONALD A. AND JENNY YAKIN FOR CUSTOMER PROTECTION UNDER THE SECURITIES INVESTOR PROTECTION ACT

ARTHUR J. GONZALEZ, Bankruptcy Judge.

On November 4, 2002, Irving H. Picard, Trustee for the liquidation of Klein, Maus & Shire, Inc. ("Klein Maus" or "Debtor") under the Securities Investor Protection Act ("SIPA"),[1] filed Trustee's Application No. 3 for an Order Upholding Trustee's Determinations Denying Claims for Customer Protection and Expunging Objections With Respect to Those Determinations (Claim Nos. 52, 53) ("Trustee's Application" or "Application") (Docket Entry 71). In accordance with procedures established by this Court's September 28, 2000 Order, the Trustee denied customer claims filed by certain individuals on account of losses allegedly sustained due to Klein Maus' unauthorized trading in their accounts. Trustee's Application seeks a determination by this Court: (i) upholding his findings to deny customer protection under SIPA to Ronald A. and Jenny Yakin ("Yakins" or "Claimants"), the individuals who filed Claims 52 and 53; and (ii) expunging the Yakins' objections. In support of the Trustee's Application, the Securities Investor Protection Corporation filed a Memorandum of Law dated November 22, 2002 ("SIPC" or "SIPC's Memo") (Docket Entry 77).

Trustee brings the Application in response to the June 29, 2001 Opposition of Ronald and Jenny Yakin to the Trustee's Determination of Customer Claim Numbers 52 and 53 of May 30, 2001 ("Claimants' Opposition"). Claimants' Opposition was filed with the Trustee in order to: (i) contest the Trustee's May 30, 2001 determination that denied Claimants SIPA customer protection and; (ii) to request that this Court reverse the Trustee's findings. Claimants' Opposition precipitated the filing of the Trustee's Application.

Argument on the Application was heard before this Court on December 4, 2002.[2] For the reasons set forth below Trustee's Application is granted.[3]

---

1. 15 U.S.C. § 78aaa *et seq.*

2. This Court's subject matter jurisdiction over this motion and the parties thereto is predicated on 15 U.S.C. §§ 78aaa et seq., and by virtue of the referral and removal of this case to this Court in accordance with 15 U.S.C. § 78eee(b)(4).

3. The Court has addressed the issues raised herein in three previous Orders:

In *In re Klein, Maus & Shire, Inc.*, Adv. No. 00–8193A (AJG) (Bankr.S.D.N.Y. June 25, 2002) *Order Upholding Trustee's Determina-* tion Denying Claim 42 of Naveed Mahfooz for Customer Protection under the Securities Investor Protection Act, this Court upheld the SIPA trustee's determination denying "customer" status with respect to a claim for unauthorized trading. The Court determined that the claimant had not met his burden of proof regarding his customer status because he had not timely objected in writing to the alleged unauthorized trades. The claimant had received trade confirmations and monthly statements, and the monthly statements contained "unambiguous language regarding the mandatory written procedures when a customer

## I. BACKGROUND

The Yakins' two claims (claim numbers 52 and 53) seek payment of a single credit balance of $248,819.00. The Yakins maintained two accounts with Klein Maus.[4] Although the Yakins filed a separate claim as to each account, the basis for both claims was a single arbitration award that was rendered on default that had been entered in favor of the Yakins and against Klein Maus and their broker, Maurice Gross. Numerous claims were raised by the Yakins' in the arbitration including, *inter alia*, unauthorized trading by Klein Maus.

### A. SIPA Filing

On August 28, 2000, the Securities Investor Protection Corporation ("SIPC") filed a complaint and application in the United States District Court for the Southern District of New York alleging, *inter alia*, that the Debtor was not able to meet its obligations to securities customers as they came due and, accordingly, the Debtor's customers needed the protection afforded by SIPA.

On September 6, 2000, after a hearing at which the Debtor failed to appear and object, the Honorable Robert W. Sweet, United States District Judge for the Southern District of New York, entered an order, pursuant to the provisions of SIPA, which, *inter alia:* (i) placed the Debtor in liquidation under SIPA; (ii) appointed the Trustee; and (iii) removed the liquidation proceeding to this Court.

### B. Klein Maus

The Debtor, a securities broker-dealer was an "introducing broker" which, from April 1997 until February 17, 1999, introduced its customers to SG Cowen Securities Corporation ("SG Cowen") pursuant to

---

wishes to challenge a transaction." The Court rejected the claimant's argument that he was misled by the debtor's representatives who did not instruct him to put his complaints in writing and failed to advise him that oral communications would not be sufficient.

In a second Order, *In re Klein, Maus & Shire, Inc.*, Adv. No. 00–8193A (AJG) (Bankr. S.D.N.Y. June 25, 2002) *Order Upholding Trustee's Determination Denying Claim 29 of Richard Agid for Customer Protection under the Securities Investor Protection Act*, this Court upheld the SIPA trustee's determination denying "customer" status with respect to another claim for unauthorized trading. The Court found that a letter dated seven months after the transaction in question was not "made within a reasonable time" and was not addressed "to a manager or other official of Klein Maus with authority to address his concerns." Even if the letter had been timely, the Court held that it was not probative of unauthorized trading since it "unconditionally authorized" the transaction.

Finally, also in *In re Klein, Maus & Shire, Inc.*, Adv. No. 00–8193A (AJG) (Bankr. S.D.N.Y. October 2, 2002) *Order on Trustee's Motion No. 2 Upholding Trustee's Determinations Denying Customer Claims for Customer Protection and Expunging Objections With Re-spect to Those Determinations (Claim Nos. 36, 37, 38)* concerning the claims and objections of International Value Group, Inc. and John and Lizabeth DiPrato, this Court found "that a claim alleging unauthorized trading in a customer account is not entitled to customer protection under SIPA in the absence of a showing by the claimant that he or she met his or her contractual obligation within a reasonable time of receipt of a trade confirmation of the transaction in question and/or monthly account statement in accordance with the instructions set forth on the reverse side of either document."

4. The Yakins filed two customer claims, Claims 52 and 53, because they had two accounts with Klein Maus. Claim 52 was filed for the Yakins' cash account—Account Number 620–87830739. Claim 53 was filed for the Yakins' margin account—Account Number 620–87831239. The claims were filed with the Trustee on December 5, 2000. However, because the two accounts bore the exact same name and taxpayer identification number, the Trustee determined that the two accounts would be deemed as one for purposes of the SIPA proceeding. The Yakins do not oppose such treatment. Therefore, the Court will treat the two accounts as one for purposes of this decision.

a Clearing Agreement dated February 13, 1997. Through the Clearing Agreement accounts for customers of the Debtor were introduced to and established at SG Cowen. The customers were informed of this arrangement. SG Cowen became responsible for processing customer transactions based on information provided by the Debtor and for the accounts of those customers.[5]

The Yakins began their relationship with Klein Maus when Maurice Gross, the Yakins' broker since 1991, accepted a position at Klein Maus in May 1997. At that time, Claimants opened a cash account with Klein Maus. Approximately one year later, in June 1998, Claimants opened a margin account.

### C. Alleged Unauthorized Trades

The Claimants allege that shortly after they opened a margin account, Klein Maus engaged in a pattern of conduct, from June 30, 1998 to October 6, 1998, that included the execution of several unauthorized trades on the Yakins' accounts ("Alleged Unauthorized Trade(s) or Trading").[6]

In connection with the Alleged Unauthorized Trades, the Yakins allege, *inter alia,* that: (i) Klein Maus made unsuitable purchases for their account; (ii) on several occasions after Alleged Unauthorized Trades, Klein Maus refused to execute or impeded the Yakins' ability to sell the securities by making misrepresentations to them to induce them to ratify the trades. Beginning in the summer of 1998, the

Claimants received statements confirming the Alleged Unauthorized Trades. Claimants state that they complained verbally to Gross and insisted that the trades be reversed, in most cases, they contend that no action was taken.

Klein Maus ceased operations on or about February 17, 1999.[7] On February 17, 1999, Ronald Yakin received a confirmation of the purchase of 145,000 shares of Intercorp. The purchase had been made on February 12, 1999, and was allegedly without his permission. The Claimant alleges that he called Gross to complain on February 17 1999. Upon being told that Gross no longer worked for Klein Maus, Yakin spoke with the firm's compliance officer, asking that the purchase be reversed. The Claimant immediately wrote to the NASD, in a letter dated February 17, 1999, to complain of the trade. The purchase was cancelled on February 24, 1999, at no loss to the Claimants.

On or about February 18, 1999, SG Cowen informed investors whose accounts had been serviced by Klein Maus that the introducing broker was no longer in business. Mr. Yakin also contacted Gross at his home. Gross informed him that he had resigned from Klein Maus on February 10, 1999. On March 4, 1999, presumably in an attempt to compensate the Yakins for their losses, Gross transferred to the Yakins a certificate for 150,000 shares of common stock of United States Financial Group, Inc., the parent company of Klein Maus.

---

**5.** Courts have generally held that allegations of unauthorized trading by an introducing broker do not give rise to damage claims against the clearing firm because it is subject to instructions from the introducing broker. *See, e.g., In re Adler Coleman Clearing Corp.,* 198 B.R. 70 (Bankr.S.D.N.Y.1996).

**6.** The Alleged Unauthorized Trades included transactions in the stocks of the following companies: Intercorp Excelle, Inc. ("Intercorp"); Hometown Auto Retailers; Rosedale

Decorative Products; and Dectron International Inc. ("Dectron") ("Stocks").

**7.** Klein Maus, a member of SIPC, was and continues to be, at least as of the date of the Trustee's Twelfth Interim Report, registered as a securities broker-dealer with the Securities and Exchange Commission and was a member of the National Association of Securities Dealers, Inc.

On April 7, 1999, the Claimants transmitted to the New York State Attorney General schedules reflecting the Alleged Unauthorized Trades in their account.

In a letter dated May 6, 1999, from Ronald Yakin to Gross, Yakin summarizes alleged conversations between himself and Gross during which Gross purportedly acknowledged unauthorized trading and failure to reverse trades. Also, the letter references the transfer of 150,000 shares of common stock. The letter also directed that Gross "countersign a copy of [the] letter to acknowledge that you understand that [Ronald Yakin has] not waived or released any rights ..."[8] Gross did in fact countersign the letter in an apparent effort to recognize that Ronald Yakin had not waived or released any rights.

### D. Yakins' Arbitration Claims

The Yakins filed an arbitration claim on or about July 12, 1999, against: Klein Maus; its president, Muhammed Ali Kahn; and Maurice Gross.

As summarized in the NASD Arbitration Award of July 2000 ("Arbitration Award"), the Yakins' arbitration claim was based on "unauthorized purchases; failure to execute sell orders; breach of the account agreement; violations of state law and NASD Conduct Rules; fraud; unsuitability; breach of fiduciary duty; conversion; violations of the Securities Exchange Act of 1934; and control person liability."

As explained in the NASD Arbitration Award, the Yakins sought compensatory damages of $753,888.00, later amended to $700,488.19, and other relief. None of the respondents filed answers or otherwise appeared in the arbitration proceeding.

The Arbitration Award made no specific factual and legal findings as to unauthorized trading. Moreover, the arbitration panel never stated which of the grounds advanced in the Yakins' arbitration complaint constituted the basis for its award.

On or about August 4, 2000, the arbitrators entered the award in favor of the Yakins in the principal amount of $248,819.00. The award was joint and several as to Klein Maus and Gross. All claims against Kahn were dismissed with prejudice.

As of August 28, 2000, the filing date of these SIPA proceedings, pursuant to SIPA and the Bankruptcy Code, all actions against the Debtor were stayed. However, on October 2, 2000, the Claimants, by counsel, obtained from the Supreme Court of New York an Order, on default, granting their motion to confirm the Arbitration Award. On November 22, 2000, they obtained from the court an unopposed Judgment confirming the award. No notice of the state court proceedings was given to the Trustee until the Claimants' counsel sent the Trustee a letter dated December 5, 2000 advising the Trustee that the Claimants intended to present the judgment to the Clerk of the Court of New York County for entry. At which time the Trustee advised Claimants' counsel that the post-petition legal proceedings had been in violation of the stay.

### II. DISCUSSION

The Trustee's Application and Claimants' Opposition present two issues for this Court's consideration.[9] First, wheth-

---

8. This was several months after Klein Maus had closed and ten months after the first Alleged Unauthorized Trade.

9. Claimants argue that "the crux of the Yakins' arbitration claims was their allegations

of unauthorized trading. And therefore, since the arbitration award was based on a finding of unauthorized trading, and because the Trustee is collaterally estopped from finding that unauthorized trading did not occur, the Yakins' account must be credited and their

er the Arbitration Award should be accorded preclusive effect on the relevant matters contained therein. Second, if this Court declines to give preclusive effect to the Arbitration Award, whether the claimants have established that the Alleged Unauthorized Trades should be accorded "customer protection" under SIPA.

### A. The Arbitration Award is Not Entitled to Collateral Estoppel

 Claimants contend that this Court should apply the doctrine of collateral estoppel and grant preclusive effect to the Arbitration Award, effectively barring the Trustee from relitigating whether the Debtor engaged in Alleged Unauthorized Trading of the Yakins account. Further, Claimants contend that they have satisfied the four elements of the doctrine of collateral estoppel: [10]

(i) the issue sought to be precluded must have been actually litigated in the prior action;

(ii) the issue must have been the same as that involved in the prior action;

(iii) the issue must have been determined by a final judgment; and

(iv) the issue must have been essential to the prior judgment.

(Claimants' Opposition & 11 citing *Davidcraft Corp. v. Baer (In re Baer)*, 161 B.R. 334, 337 (Bankr.E.D.N.Y.1993) *citing Graham v. Billings (In re Billings)*, 94 B.R. 803 (Bankr.E.D.N.Y.1989)).

However, as will be explained below, this Court declines to grant preclusive effect to the Arbitration Award.

### 1. Actually Litigated

First, the Court must consider whether the issues were actually litigated and whether the Debtor had a full and fair opportunity for trial of the issues. *In re Baer*, 161 B.R. at 337.

 Where a prior judgment has been obtained by default, there is no actual litigation of the issues and accordingly, no collateral estoppel bar. *Arizona v. California*, 530 U.S. 392, 414, 120 S.Ct. 2304, 2319, 147 L.Ed.2d 374, 396 (2000) citing *Restatement (Second) of Judgments* § 27, p. 250 (1982); *Abrams v. Interco Inc.*, 719 F.2d 23, 33 n. 9 (2d Cir.1983) ("accepted view that the decision of issues not actually

---

SIPA claim approved." (Claimants' Opposition & 14).

**10.** Claimants also assert that New York collateral estoppel principles are identical as those applied by the Second Circuit. The "preclusive effect of an arbitration award depends on the basis of the federal court's subject matter jurisdiction." *Borchers v. DBL Liquidating Trust (In re Drexel Burnham Lambert Group, Inc.)*, 161 B.R. 902, 906 (S.D.N.Y.1993). Yakins' "claims are founded on alleged violations of federal securities laws." *Id.* Thus, federal preclusion rules should apply. Further, the parties do not dispute that federal preclusion rules apply.

In addition to the articulation of the test offered by Claimants, collateral estoppel has been defined as follows:

Furthermore, the test using New York State preclusion rules has been defined as a two prong analysis. As stated in *In re Krautheim-*

*er*, 210 B.R. 37, 50 (Bankr.S.D.N.Y.1997), first a court must consider whether the issue was necessarily decided; and second the court must determine whether the party had a "full and fair opportunity" to litigate the issue which requires an investigation into the "context and circumstances surrounding the prior litigation that may have deterred the party from fully litigating the matter." *Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir.1993).

The "full and fair opportunity" prong of the above analyses has not been satisfied by Claimants. In light of the circumstances, Klein Maus had no incentive to defend against the arbitration complaint since the firm had been out of business for five months when the complaint was filed.

Even if the Court applied New York State preclusion rules it would still find that the award should be denied claim preclusion.

litigated, e.g., a default judgment, has no preclusive effect in other litigation"); *In re Billings,* 94 B.R. at 808–809. Further, the Court must inquire whether there was a full and fair opportunity for litigation in the prior proceeding. *See Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997).

■ The arbitration complaint was filed after Klein Maus had closed. Klein Maus never answered and did not defend against the arbitration complaint. The Arbitration Award and the New York State Court judgment (entered in violation of the automatic stay) were entered on default. Under the circumstances presented, the default judgment entered in the arbitration proceedings is not entitled to collateral estoppel.

Furthermore, there may have been actual defenses to any of the alleged Unauthorized Trades. Principally, the Court observes that the failure of the Claimants to complain of the Alleged Unauthorized Trades in a timely fashion (see *infra* Discussion section B) and the absence of a written complaint suggests ratification of the trades by Claimants. This defense would likely have been a defense raised in the context of the arbitration had it been actually litigated.

Having found the issues were not "actually litigated" is sufficient, standing alone, to deny preclusive effect. However for the sake of completeness, the Court will address the balance of the issue preclusion rules.

### 2. Identity of the Issues

As to the second element of identity of the issues, although the Arbitration Award was entered on a complaint that included a number of legal theories, Claimants' central factual allegations involve Alleged Unauthorized Trading. However, the arbitrator's silence with respect to the other issues raised by the arbitration complaint does not compel the conclusion that the award was based on a finding of on unauthorized trading.

A review of the Yakins' arbitration claims bears this out. Paragraph 29(f) of the Yakins' arbitration complaint avers that Klein Maus violated the Securities Exchange Act of 1934 by manipulating the price of the Stocks. Claimants have not established that the arbitration award was not based upon this aspect of the arbitration complaint which did not necessitate a finding of unauthorized trading.

Also, paragraph 29(b) of the Yakins' arbitration complaint enumerates five types of fraudulent conduct that Claimants assert Klein Maus engaged in and in violation of, *inter alia,* the Securities Exchange Act of 1934. Included is Klein Maus' alleged refusal to execute alleged sell orders placed by Claimants. However, "refusal to execute a sale order, be it intentional, willful or negligent, does not amount to the affirmative act required to establish conversion." *SIPC v. Stratton Oakmont, Inc.,* 229 B.R. 273, 280 (Bankr.S.D.N.Y.1999). Because refusal to execute a sell order cannot be deemed to fit within conversion, it cannot fall within the definition of customer claims. *Id.*

■ Moreover, "in order to have a preclusive effect, an arbitration award must be unambiguous as to the issues raised and addressed in the arbitration." *Barnes v. Printron, Inc.,* No. 93 Civ. 5085, 1995 WL 649936, at *2, 1995 U.S. Dist. LEXIS 16353, at *5 (S.D.N.Y. November 3, 1995). As previously discussed, the arbitration complaint contained multiple causes of action against the Debtor all seeking identical damages. Therefore, a finding for Claimants on any one of these claims could have given rise to the relief granted. Indeed, if the Arbitration Award was based

on a theory other than unauthorized trading, Claimants would not be eligible for customer protection and their Arbitration Award would be treated as a general unsecured claim. As demonstrated by the issues raised in paragraphs 29(b), and (f) of the arbitration complaint, the Court cannot conclude that the Arbitration Award was premised on legal and factual theories that fall exclusively within the parameters of unauthorized trading.

Arguably, the arbitrators could have found that there were unauthorized trades that were ratified and the award was based upon a finding of liability for price manipulation. Without specific findings by the arbitrators, this Court cannot employ the doctrine of collateral estoppel to either the claims for Alleged Unauthorized Trading, or the Arbitration Award. Although competing inferences can be drawn from the record of the arbitration proceedings, the issues raised before the arbitrators are patently distinguishable from those brought by claims 52 and 53.

### 3. Final Judgment

■■■ In *Borchers v. DBL Liquidating Trust (In re Drexel Burnham Lambert Group, Inc.)*, 161 B.R. 902, 906 (S.D.N.Y. 1993), the court addressed the issue of whether an arbitration award that had not been confirmed by a court could be given preclusive effect. The court concluded that Aif the other elements of collateral estoppel are met, the doctrine of collateral estoppel could be applied to the arbitration "ward, notwithstanding the fact that it is unconfirmed." *Id.* at 907. Thus, for the purpose of this discussion, the Court finds that even though the confirmation of the Arbitration Award was void because it was obtained in violation of the automatic stay, the Arbitration Award could be given preclusive effect if the other elements of collateral estoppel were met.

### 4. Whether the Issue Was Necessary to the Decision

The Court finds that determination of unauthorized trading was not essential or necessary for the panel to reach its decision. The Claimants alleged ten grounds, ranging from fraud to breach of contract to unsuitability, as possible bases for recovery. The arbitration panel articulated no basis for its decision. Indeed, it awarded the Claimants a substantially smaller amount than requested, and dismissed, with prejudice, the charges as to the principal of the firm. Under the circumstances, the Claimants' argument that the panel necessarily credited the assertion of unauthorized trading is unfounded. *In re Krautheimer*, 210 B.R. 37, 53 (Bankr. S.D.N.Y.1997) (party asserting collateral estoppel has burden of "introducing a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action").

The arbitrators never made or adopted any findings of fact, and this Court may not infer the factual basis for the arbitrator's decision and then use those inferences to award Claimants customer protection on the basis of collateral estoppel.

The arbitrators did not indicate the basis of Debtor's liability. Thus, it cannot be said as a matter of law that the issue of unauthorized trading was necessary to the arbitrators' decision because although presented with multiple causes of action, the Arbitration Award itself is devoid of any factual findings and thus could have been based on any one or more theories of liability as set forth in the arbitration complaint.

Thus, the Court concludes that the Trustee correctly declined to accord collateral estoppel to the Arbitration Award. The Court turns to the merits of the Claimants' unauthorized trading claims.

### B. The Yakins' Claim for Unauthorized Trading Is Not Entitled to "Customer Protection"

As will be more fully set forth below, the Court concludes that Claimants' assertion that the Alleged Unauthorized Trades are entitled to customer protection is without merit.

#### 1. "Customer" Defined

"Customer" as defined in section 78*lll*(2) of SIPA is a term of art. A creditor with customer protection under SIPA is entitled to preferential treatment over other creditors in the distribution of assets of the debtor's estate marshaled by the Trustee.[11] Under SIPA, a customer is:

[A]ny person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security or for the purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purposes of purchasing securities.

15 U.S.C. § 78*lll*(2).

■ SIPA clearly places the burden of proof to establish customer status on the claimant by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." 15 U.S.C. § 78fff–2(b). Further, the satisfaction of a claim Amay be conditioned upon the trustee requiring the claimants to execute or provide appropriate receipts, supporting affidavits, releases and assignments. *Id.*

■ The courts have consistently taken a restrictive view of the definition of a "customer" under SIPA and, accordingly, the burden is not easily met. In *In re MV Securities, Inc.*, 48 B.R. 156, 160 (Bankr. S.D.N.Y.1985), the Bankruptcy Court stated that the Second Circuit "has approved a narrow reading of the 'customer' definition in SIPA," citing *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314, (2d Cir.1976) and *SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280 (2d Cir.1974). *See also Schultz v. Omni Mutual, Inc.*, [1993–94] Fed. Sec. L. Rep. & 98,095 at p. 98, 763, 1993 WL 546671, (S.D.N.Y.1993) (claimant seeking customer status bears burden of proving claim of the kind supported by SIPA); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr.S.D.N.Y.1997) (claimant must demonstrate both that he is a customer as defined in SIPA and that he has entrusted cash or securities to the debtor for trading in securities markets); *In re A.R. Baron Co., Inc.*, 226 B.R. 790, 795 (Bankr. S.D.N.Y.1998) ("claimants seeking a preferred status bear the burden of showing

---

**11.** The preference extended to "customers" in a SIPA liquidation involves the availability of funds from both the debtor's estate and external funds made available by SIPA. Each customer's claim for "net equity" as defined in 15 U.S.C. § 78*lll* (11) (the difference between what is owed to the customer by the debtor and what is owed by the customer to the debtor) is satisfied *pro rata* from the assets of the debtor. If that *pro rata* share does not satisfy a customer's claim, SIPA authorizes the Securities Investor Protection Corporation ("SIPC") to advance funds to the Trustee of up to $500,000 for each customer, with a maximum of $100,000 of the claim which is for cash rather than for securities. 15 U.S.C. § 78fff–3(a)(1). Claimants of the debtor's estate who are not "customers" under SIPA must seek recovery from the assets of the general estate on the same terms as the debtor's other general creditors. 15 U.S.C. § 78fff–2(c)(1)(B).

that they are within the class of eligible persons").

■ The SIPA statute contemplates the return to customers of cash and securities that were "received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts" of the customers. 15 U.S.C. § 78*lll*(2). So long as such property is owed on the SIPA filing date, the investor has a "customer" claim. 15 U.S.C. § 78*lll*(2) and § 78*lll*(4). The fact that the property is missing, perhaps due to unauthorized trading, does not affect "customer" status. *See In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 75 (Bankr.S.D.N.Y.1996).

**2. *Duties With Respect to Claims for Unauthorized Trading***

Evidence of a timely written response is essential in disputes regarding securities. As the Second Circuit noted in *Modern Settings, Inc. v. Prudential–Bache,* 936 F.2d 640, 645–46 (2d Cir.1991), the purpose of the 10–day written complaint clause in the customer agreement is to require the customer to memorialize his or her complaint soon after receipt of the account statement rather than waiting to see if the trade is profitable. The writing requirement of the clause insures that unauthorized trading disputes are not relegated to "swearing contests" between broker and customer. For these reasons, broker-customer agreements requiring written notice of objection within a limited amount of time after the customer receives confirmation of the transaction generally have been enforced by courts.

The *Modern Settings* court rule that an investor's failure to object in writing on a timely basis absolves the broker from liability has been consistently followed by the courts in this circuit. *See Richardson Greenshields Sec., Inc. v. Lau,* 819 F.Supp.

1246, 1259–60 (S.D.N.Y.1993) (Timely complaint is necessary to give the broker a chance to correct a disputed trade. In the absence of such a complaint, the customer may play the market with impunity and complain only if a trade becomes a losing proposition.); *In re Drexel Burnham Lambert Group, Inc.,* 157 B.R. 539, 543 (S.D.N.Y.1993).

■ If trades were unauthorized, it was incumbent upon the Claimants to complain in writing and on a timely basis. The confirmation and account statements that the clearing broker sent to them gave them ample notice of their duty to complain. The reverse side of the SG Cowen customer statement required:

> This transaction shall be deemed correct if not objected to by you in writing within ten (10) days of receipt.

Similarly, the reverse side of every page of the account statements provided:

> Please examine this statement carefully. If you think that your statement is incorrect for any reason, ... you should contact the Manager of the office servicing your account or Manager, Customer Service Department, SG Cowen Securities Corporation, Financial Square, New York, N.Y. 10005 (tel. 800–861–9789).

> This statement will be deemed correct if not objected to by you within ten (10) days after mailing by us.

A timely written complaint by the Claimants of unauthorized trading would have been proof that unauthorized trading had occurred.

Claimants knew what had transpired in their accounts. They received a confirmation of each objectionable trade, and account statements showing their holdings. The statements cautioned that if there was an error in an account, the investor needed to complain, in writing, within ten days to

the Manager of Klein Maus or to the Manager of SG Cowen's Customer Service Department. The Yakins issued no timely written complaint with respect to the trades at issue, waiting instead until the securities had dropped in value, to take action.

Yet, the Claimants knew how to have a trade corrected. Mr. Yakin's complaint to the compliance officer of Klein Maus and to the NASD Regulation regarding the February 1999 purchase of Intercorp stock resulted in a correction of the trade within days.

Furthermore, other actions of the Claimants suggest that their delay in complaining was intended. In their arbitration claim, they acknowledged that they were persuaded by the salesman to "ratify" the Allegedly Unauthorized Trades. Moreover, if trades were "unauthorized," the Claimants did not insist upon a correction by the broker.

With respect to the Dectron stock, instead of demanding that the purchases be reversed, Mr. Yakin sold shares in increments as the price of the stock rose. The fact that the Claimants sold the stock in increments, at a profit, instead of insisting on a cancellation of the purchases is inconsistent with their contention of Alleged Unauthorized Trades.

Finally, the May 6, 1999 letter, countersigned by Gross, which states that Gross "failed or [was] not able to reverse several of the unauthorized purchases" does not establish that Gross had deceived the Claimants into forestalling the customer's filing of the required written complaint. This letter does not establish which purchases were unauthorized. Further, the letter directed that Gross "countersign a copy of [the] letter to acknowledge that you understand that [Ronald Yakin has] not waived or released any rights . . ." The countersignature merely recognized that Ronald Yakin had not waived his rights. It did not constitute an admission of unauthorized trading.

### 3. The Trustee Properly Denied the Claims for Unauthorized Trading

■ The Trustee denied the two claims of the Yakins on the ground that he could not accept the Claimants' assertion of unauthorized trading because they had not complained on a timely basis, to the correct party, or in accordance with the procedures that the clearing broker had notified them that they needed to follow in order to object to an error in an account.

■ The fact that the property is missing, perhaps due to unauthorized trading, does not affect "customer" status. *See In re Adler Coleman Clearing Corp.*, 198 B.R. at 75 ("Unauthorized trading losses may constitute a customer claim under SIPA only if it was conducted by debtor because, by definition, 'customer property' includes the proceeds of any such property transferred by the debtor, including property unlawfully converted"). But before an investor can recover the misappropriated or misused property, he must prove that it was traded without his permission. As explained above, the Claimants did not establish such.

### 4. Claimants Do Not Have a Claim That Is Entitled to Customer Protection

■ There also is no reason to give weight to the Arbitration Award because it was not an award for the return of investor property in the possession of the broker, but by the Yakins' own admission, it was for damages. Thus, the Claimants argue that the arbitration panel did not award the $750,000.00 they sought, but rather, after weighing the evidence presented at the hearing, awarded compensa-

tory damages in an amount the panel felt was supported by the evidence.

Because claims for damages do not involve the return of customer property entrusted to the broker they are not the claims of "customers" under SIPA. Likewise, claims for damages resulting from a broker's misrepresentations, fraud or breach of contract are not protected. *In re MV Securities, Inc.,* 48 B.R. at 160. Even if it is assumed that their losses were caused by fraud, breach of contract, or a similar theory, they are general creditors.

Moreover, the Trustee concluded that as of August 28, 2000, Klein Maus did not have an account in the Yakins' name nor did it otherwise hold securities or cash and as such there was no "net equity" as defined in SIPA.

The Trustee correctly determined that the claimants are not eligible for "customer" status in this proceeding.

Therefor, it is hereby,

ORDERED, the Trustee's determination denying claims 52 and 53 filed by Ronald A. and Jenny Yakin for customer protection under SIPA is UPHELD; the Claimants' Objections are EXPUNGED; and the Trustee's Application is GRANTED.