In re NEW TIMES SECURITIES SER-VICES, INC., and NEW AGE FINAN-CIAL SERVICES, INC., Debtors,

Mary Ann Stafford, Rheba Weine, Joel Weine, Plaintiffs–Appellees,

v.

James Giddens, as Trustee for the Liqui-dation of the Substantially Consoli-dated Estates of New Times Securities Services, Inc. and New Age Financial Services, Inc., Securities Investor Pro-tection Corporation, Defendants–Ap-pellants.

Docket No. 05–5527–BK.

United States Court of Appeals, Second Circuit.

Argued: April 21, 2006.

Decided: Sept. 7, 2006.

James B. Kobak, Jr. (Christopher K. Kiplok, on the brief), Hughes Hubbard & Reed LLP, New York, NY, for Defendant–Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc., and New Age Financial Services, Inc.

Christopher H. Larosa, Assistant General Counsel (Josephine Wang, General Counsel, on the brief), Securities Investor Protection Corp., Washington, DC, for Defendant–Appellant Securities Investor Protection Corp.

May Orenstein (Sigmund Wissner-Gross, on the brief), Brown, Rudnick, Berlack, Israels LLP, New York, NY, for Plaintiffs–Appellees.

Before: WALKER, Chief Judge, JACOBS, and WALLACE,* Circuit Judges.

JACOBS, Circuit Judge.

In the wake of the bankruptcy of two brokerage houses[1], plaintiffs-appellees Maryann Stafford and Rheba and Joel Weine ("plaintiffs") claimed an entitlement as "customers"—as defined by the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa et seq. ("SIPA" or the "Act")—to recover their losses from the funds SIPA reserves for such customers. The brokerage houses were instrumentalities of a Ponzi scheme engineered by their principal, William Goren; the plaintiffs, who were among the victims, had had accounts at the brokerage houses that contained substantial (but illusory) funds. The plaintiffs were induced to liquidate their accounts (in whole or in part) and make a loan of the imaginary funds to the brokerage houses and to Goren. The trustee for the SIPA liquidation of the brokerage houses ("Trustee") concluded that the plaintiffs were lenders, not "customers," and denied their claims to SIPA funds, and the United States Bankruptcy Court for the Eastern District of New York (Cyganowski, B.J.) agreed. The United States District Court for the Eastern District of New York (Seybert, J.) reversed, and this appeal is taken from that judgment by the Trustee and the Securities Investor Protection Corporation (the "SIPC"). We reverse, and remand to the district court with instructions to reinstate the judgment of the bankruptcy court.

I

The facts of the case are undisputed. Goren conducted a Ponzi scheme using the two brokerage houses (the "Debtor"). He solicited investments in fictional money market funds; he pretended to invest in genuine money market funds; and he issued fraudulent promissory notes. See In re New Times Sec. Servs., Inc., 371 F.3d 68, 71 (2d Cir.2004). In 1998, Stafford and the Weines invested ($75,000 and $35,000, respectively) with Goren for the purchase of securities. In 1999, they voluntarily authorized Goren to sell some or all of their securities accounts and reinvest the proceeds in interest-bearing promissory notes, with Goren and the Debtor as obligors.

On February 17, 2000, the SEC filed a complaint against the Debtor, and applied for orders freezing the Debtor's assets and appointing a temporary receiver. The district court granted the orders the next day. The statutory filing date for SIPA purposes is therefore February 17, 2000. See 15 U.S.C. § 78lll(7)(B). On that date, the plaintiffs were holding the promissory

---

* The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

1. New Times Securities Services, Inc. and New Age Financial Services, Inc.

notes. The Debtor was subsequently placed into SIPA liquidation, and the Trustee was appointed to oversee the liquidation under procedures established by the bankruptcy court.

The plaintiffs filed SIPA customer claims with the Trustee; the Trustee denied the claims insofar as they sought SIPA protection for the face amount of their promissory notes. The bankruptcy court affirmed the Trustee's rejection of the claims, holding that SIPA customer status is determined as of the filing date of a debtor liquidation and that the promissory notes held by plaintiffs at the filing date rendered them "lenders," not "customers," for SIPA purposes.[2] The district court reversed the bankruptcy court, on the ground that the plaintiffs' original securities investments with the Debtor established their status as "customers" and that their subsequent decision—fraudulently induced by Goren—to liquidate those securities investments and provide Goren and the Debtor with loans in exchange for promissory notes did not change their "customer" status.

## II

We review *de novo* the district court's conclusions of law and its application of law to the undisputed facts. *See Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir.2005).

"The principal purpose" of SIPA is "to protect investors against financial losses arising from the insolvency of their brokers." *SEC v. S.J. Salmon & Co.*, 375 F.Supp. 867, 871 (S.D.N.Y.1974). The Act advances this purpose by according those claimants in a SIPA liquidation proceeding who qualify as "customers" of the debtor priority over the distribution of "customer property."[3] *See* 15 U.S.C. §§ 78fff–2(b) & (c)(1), 78lll(4). Each customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing.[4] *See* 15 U.S.C. § 78fff–2(c)(1)(B). If the fund of customer property is insufficient to make the customers whole, the government makes up the difference—subject to a cap—out of a special SIPC fund capitalized by the general brokerage community. *See* 15 U.S.C. §§ 78fff–3, 78ddd; *see also SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 980 (2d Cir.1974).

"Judicial interpretations of 'customer' status support a narrow interpretation of the SIPA's provisions." *In re Stalvey & Assocs., Inc.*, 750 F.2d 464, 472 (5th Cir. 1985) *accord In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 418 (Bankr.S.D.N.Y. 2003) (collecting cases). "The Act contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to others." *SEC v. F.O. Baroff Co.*, 497 F.2d 280, 282 n. 2 (2d Cir.1974). A specific distinction is drawn between (i) "customers" and (ii) those in a lending relationship with the debtor (*i.e.*, "lenders"):

---

2. The bankruptcy court noted that the Eastern District of New York had arrived at the same conclusion in a case involving litigants who also possessed the worthless promissory notes on the date of filing, but who had made those investments directly (and not with the proceeds from liquidation of their brokerage accounts). *See SEC v. Goren*, 00–CV–970/800–8178–288 (E.D.N.Y.2002) (Memorandum and Order).

3. SIPA defines "Customer Property" as "cash and securities ... at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78lll(4).

4. SIPA defines "net equity" as "the dollar amount of the account or accounts of a customer." 15 U.S.C. § 78lll(11).

The term *"customer"* of a debtor means any person ... who has a claim *on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping,* with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" *includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities,* but does *not* include—

\* \* \* \* \* \*

(B) *any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor,* or is subordinated to the claims of any or all creditors of the debtor ....

15 U.S.C. § 78*lll*(2) (emphasis added); *see also Appleton v. First Nat'l Bank of Ohio,* 62 F.3d 791, 801 (6th Cir.1995) (stating that "[t]he critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities.").

▆ That subsection (2), which was added to SIPA in 1978, *see* Pub.L. No. 95–283, 92 Stat. 249, thus distinguishes between (i) claimants (protected as customers) who are engaged through brokers in trading activities in the securities markets and (ii) those (unprotected) claimants who are relying on the ability of a business enterprise to repay a loan.[5] "Lenders are simply not a class to be specially protected under SIPA and in fact were expressly excluded from the definition of customer upon the enactment of the 1978 amendments to SIPA." *In re Hanover Square Sec.,* 55 B.R. 235, 238–39 (Bankr.S.D.N.Y. 1985). Whether an individual enjoys "customer" status thus turns on the transactional relationship. *See Baroff,* 497 F.2d at 284 (contrasting indicia of "the fiduciary relationship between a broker and his public customer" with characteristics of "an ordinary debtor-creditor relationship"). A loan transaction that is unrelated to trading activities in the securities market does not qualify for SIPA protection.

The SIPA scheme assumes that a customer—as an investor in securities—wishes to retain his investments despite the liquidation of the broker; the statute thus "works to expose the customer to the same risks and rewards that would be enjoyed had there been no liquidation." 6 Collier on Bankr.P 741.06[6] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.); *see also In re Adler Coleman Clearing Corp.,* 195 B.R. 266, 274 (Bankr. S.D.N.Y.1996). It is a customer's legitimate expectations on the filing date—here, February 17, 2000—that determines the availability, nature, and extent of customer relief under SIPA. *See* 15 U.S.C. §§ 78fff–2(b), 78*lll*(7) & (11); *see also In re New Times Secs. Servs., Inc.,* 371 F.3d 68, 87 (2d Cir.2004) (suggesting that principle that a "customer's 'legitimate expecta-

---

**5.** This distinction was first drawn in opinions by this court. *See Baroff,* 497 F.2d at 284; *Sec. Investor Prot. Corp. v. Exec. Sec. Corp.,* 556 F.2d 98, 99 (2d Cir.1977) (per curiam) ("Congress intended to protect the public customer 'as *investor* and *trader,* not ... others who might become creditors of the broker-dealer for independent reasons.' " (emphasis and alteration in original) (quoting *Baroff,* 497 F.2d at 283)). Apparently, through the passage of the 1978 amendments to SIPA, Congress "intended to codify decisions such as *Baroff* and *Executive Securities.*" *In re Hanover Square Secs.,* 55 B.R. 235, 239 (Bankr.S.D.N.Y.1985) (citing to a 1978 Senate Committee hearing).

tions,' based on written confirmations of transactions, ought to be protected" informs interpretation of SIPA); *In re Stratton Oakmont*, 2003 WL 22698876, at *7 (S.D.N.Y. Nov. 14, 2003) ("[W]hether customers have claims for securities or for cash hinges on what they expected to have in their accounts on the filing date."); *Adler Coleman*, 195 B.R. at 274 ("[T]he Trustee must promptly deliver customer name securities to the debtor's customers as they are entitled to receive them and to distribute customer property and otherwise satisfy customer net equity claims to the extent provided for in § 78fff."); S.Rep. No. 95–763, at 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 764, 765 ("By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the [1978] Amendments not only would satisfy the customers' legitimate expectations, but also would restore the customer to his position prior to the broker-dealer's financial difficulties.").

The promissory notes held by the plaintiffs on the filing date entitled them as holders to (i) a return of principal at a fixed time and (ii) interest at a fixed rate (18 percent); these are just the type of debt instruments whose possession brings claimants within the category of unprotected lenders.[6] *See In re Mason Hill & Co.*, 2003 WL 23509197, at *4 (Bankr.S.D.N.Y. Dec.10, 2003) (denying SIPA "customer" status to holder of "essentially a promissory note"); *Hanover Square*, 55 B.R. at 238 (denying SIPA "customer" status to hold-

ers of subordinated loan agreements collateralized by securities).[7]

The district court concluded that because the plaintiffs were fraudulently induced to invest in the promissory notes, their legitimate expectations essentially froze at the moment that they sold their securities, and they therefore retain customer claims for "cash"—defined as money deposited with the broker (but not actually invested in securities).[8] In reaching this conclusion, the district court relied on *In re New Times Securities Services*, in which customers deposited money with a broker for the purchase of securities that turned out to be wholly fictitious. 371 F.3d at 71–72. The *New Times* court determined that the customers had claims for securities, even though their "securities" were fictitious, because they had a legitimate expectation that they had invested in securities. *See id.* at 86 ("[W]e find that because the Claimants directed that the money they placed with the Debtors be used to purchase securities—and, importantly, because they received confirmations and account statements reflecting such purchases—they are not the types of cash depositors envisioned by the drafters of the 'claims for cash' provision."). Because there were no such securities, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the *New Times* court determined that the securities should be valued ac-

---

**6.** Plaintiffs do not contest that their investment in the promissory notes would normally bring them out of the ambit of SIPA "customer" status.

**7.** The district court agreed that "at the time of the filing date, [the plaintiffs] believed they were creditors, not customers."

**8.** Under SIPA, the only relevant difference between a customer claim for cash and a

customer claim for securities is in the maximum limit that SIPC may advance to the SIPC trustee to satisfy customer claims that cannot be met from the customer property; the maximum for securities is $500,000, *see* 15 U.S.C. § 78fff–3(a), while the maximum for cash is $100,000, *see* § 78fff–3(a)(1). *See In re New Times Secs. Servs.*, 371 F.3d at 73.

cording to the amount of the initial investment. *See id.* at 87–88. The court declined to base the recovery on the rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' "legitimate expectations" would lead to the absurdity of "duped" investors reaping windfalls as a result of fraudulent promises made on fake securities. *See id.*

■ *New Times* does not support the plaintiffs' claims. In *New Times,* the customers were customers for securities because they had a legitimate belief that they were investing in securities. The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations. In contrast, the plaintiffs here decided to swap their SIPA-protected securities investments for non-protected loan instruments. The plaintiffs authorized the loans, received confirmation and account statements indicating that they had made the loans (and referring to the instruments as "private notes"), and accepted interest payments in connection with the loans. Their only legitimate expectation must have been that they were lenders. True, they started as customers, and they would have been victimized in that status but for other fraudulently-induced transactions; so there is an unreal cast to the transactions that altered the expectations that govern under SIPA. However, as noted *supra,* "customer status in the course of some dealings with a broker will not confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute." *In re Stalvey,* 750 F.2d at 471; *see Baroff,* 497 F.2d at 282 n. 2. The plaintiffs were defrauded by their broker, but "SIPA does not protect against all

cases of alleged dishonesty and fraud." *In re Stratton Oakmont, Inc.,* 239 B.R. 698, 701–02 (S.D.N.Y.1999); *see S.J. Salmon & Co.,* 375 F.Supp. at 870–71.

\* \* \* \* \* \*

The judgment of the district court is reversed, and the case is remanded to the district court with instructions to reinstate the judgment of the bankruptcy court.